SISKIYOU REGIONAL EDUCATION PROJECT; Klamath–Siskiyou Wildlands Center; Oregon Natural Resources Council Fund; Sierra Club;

American Lands Alliance; The Wilderness Society; Pacific Rivers Council; Defenders of Wildlife, Plaintiffs–Appellants,

v.

Linda GOODMAN, Regional Forester, Pacific Northwest Region of the Forest Service; United States Forest Service, Defendants–Appellees,

American Forest Resource Council; CLR Timber Holdings, Inc.; East Fork Lumber Co., Inc.; South Coast Lumber Co., Defendant–Intervenors–Appellees.

No. 06–35266.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 15, 2006 *.

Filed Jan. 24, 2007.

---

* This panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

Pregerson, Circuit Judge, filed an opinion concurring in part and dissenting in part

Peter M.K. Frost, Esq., Western Environmental Law Center, Eugene, OR, Marc D. Fink, Esq., Duluth, MN, Todd D. True, Esq., Kristen L. Boyles, Esq., Earthjustice Legal Defense Fund, Seattle, WA, for Plaintiffs–Appellants.

Lisa E. Jones, Esq., Wells Burgess, Esq., Benjamin Longstreth, Esq., DOJ—U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, James L. Sutherland, Esq., USEU—Office of the U.S. Attorney, Eugene, OR, for Defendants–Appellees.

Scott W. Horngren, Esq., Haglund Kirtley Kelley Horngren & Jones, LLP, Portland, OR, for Defendant–Intervenors–Appellees.

694

Before: REAVLEY,** PREGERSON, and CALLAHAN, Circuit Judges.

### MEMORANDUM ***

■ The appellants seek reversal of the district court's grant of summary judgment to the appellees. They also seek to enjoin the appellees' plan for forest recovery in the aftermath of the Biscuit Fire, in particular, the appellees' proposed salvage of dead wood that burned as a result of the fire. The appellants claim that the recovery project violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq.* Also at issue is the Forest Service's Northwest Forest Plan ("NWFP"), which the Forest Service has incorporated into its management plans for the Siskiyou Forest. Despite the expedited briefing schedule in this case, the parties have done a good job in providing us with a full record to appreciate the issues and the interests at stake. Because the parties are familiar with the facts of this case, we reference the facts here only as they are necessary to explain our disposition. We have jurisdiction under 28 U.S.C. § 1291 and affirm.[1]

### STANDARD OF REVIEW

"Because the district court is in no better position than this court to review the administrative record," this court conducts de novo review of a final agency decision. *Ramstad v. Hodel,* 756 F.2d 1379, 1382 (9th Cir.1985). Nevertheless, " '[g]reat deference is shown to an administrative agency's interpretation of the law which it is charged with administering.' " *Id.* (quoting *Baker v. United States,* 613 F.2d 224, 226 (9th Cir.1980)). Agencies are entitled deference to their interpretation of their own regulations, including forest plans. *Forest Guardians v. U.S. Forest Serv.,* 329 F.3d 1089, 1097, 1099 (9th Cir.2003).

Our review of the appellants' claims is governed by the Administrative Procedure Act ("APA"), which specifies that an agency action may be overturned only where it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Idaho Sporting Cong. v. Thomas,* 137 F.3d 1146, 1149 (9th Cir.1998) (applying arbitrary and capricious standard to NEPA and NFMA claims). Because the standard is narrow, we may not base our judgment on whether

** The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

*** This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36–3.

1. The appellants seek leave to file two supplemental declarations (and accompanying exhibits). In response, the appellees have filed a motion to strike the proposed supplemental declarations or, in the alternative, to permit supplementation of the record with two of their own declarations (and accompanying exhibits). While a reviewing court will not normally allow materials not considered by the trial court, *Daly–Murphy v. Winston,* 837 F.2d 348, 351 (9th Cir.1987), a reviewing court has discretion in granting or denying motions to supplement the record. *United States v. Becker,* 929 F.2d 442, 445 (9th Cir. 1991). Neither side claims that any prejudice would result by supplementing the record with the proposed declarations. We grant the parties' motions to supplement the record and deny the motion to strike because the addition of these declarations provide a better understanding of current conditions at the recovery area.

the agency could have made an administrative decision differently.[2] *Ocean Advocates v. U.S. Army Corps of Eng'rs,* 402 F.3d 846, 858 (9th Cir.2005). Instead, the role of this court is to determine whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Id.* at 859 (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)).

## DISCUSSION

### 1. The Recovery Project Demonstrates Compliance with the Standards and Guidelines of the NWFP

█ The appellants argue that the recovery project violates the NWFP's standards and guidelines for late-successional reserves ("LSRs") by failing to provide a rational account of how the salvage will avoid negative effects on habitat suitability now and in the future, and, in particular, how the removal of snags (standing, partly, or completely dead trees, often missing tops or most of their smaller branches) from LSRs is consistent with the NWFP's requirement to retain those snags. The appellants misinterpret the NWFP and a review of the administrative record affirms that the Forest Service considered all of the relevant factors.

The appellants focus on a statement in the NWFP providing that salvage in LSRs "will not be driven by economic or timber sale program factors." This perspective, however, should be read in the context of the NWFP's plain language allowing for the "removal of trees" from LSRs "following a stand-replacing event such as those caused by ... fires[.]" The Biscuit Fire was precisely such a "stand-replacing event." Moreover, the NWFP states that "[s]alvage is not required to be beneficial, but is designed to permit the recovery of timber volume in those instances where catastrophic events clearly kill more trees (resulting in more snags and down logs in the short and long term) than are needed to maintain [LSR] conditions."[3] The NWFP further notes that "[s]alvage of dead trees is not generally considered a silvicultural treatment within the context of [the NWFP's] standards and guidelines." The fact that there may be some incidental economic benefit from the recovery project's sale of burned trees is not contrary to and does not overshadow the NWFP's primary goals of forest protection and restoration. In addition, the sale of designated burned trees will contribute to the funds that are necessary for the Forest Service to complete the recovery project.

**2.** As here, when an agency's particular technical expertise is involved, we zealously guard the agency's discretion. *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 376–77, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1980); *see also Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) ("When examining this kind of scientific determination ... a reviewing court must generally be at its most deferential."). Our role is not to weigh conflicting expert opinions or to consider whether the agency employed the best methods. *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 986 (9th Cir.1985); *see also Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.,* 451

F.3d 1005, 1017 (9th Cir.2006) ("When specialists express conflicting views, we defer to the informed discretion of the agency.").

**3.** To the extent that the appellants' argument rests on the premise that salvage operations will occur in LSRs that survived the Biscuit Fire, that premise is incorrect. The Forest Service's conclusions that salvage will not diminish LSR habitat suitability are based on the fact that no LSR habitat unaffected by the fire will be salvaged. Salvage will occur only in LSR habitat conditions that were subjected to the Biscuit Fire.

The Final Environmental Impact Statement ("FEIS") shows that the Forest Service followed the NWFP salvage guidelines and reasonably determined that the proposed salvage of certain burned trees and snags complies with the NWFP. The Forest Service has described in detail how the proposed salvage operations will comply with *all 11* of the NWFP's standards and guidelines for salvage following a catastrophic fire, explaining that the limited salvage proposed for the recovery project will not diminish the suitability of LSR habitat.[4]

Furthermore, the record provides reasonable support for the FEIS's conclusion that the proposed salvage is expected to maintain or even improve future habitat suitability. The recovery project is therefore consistent with the NWFP, which notes that "[i]n some cases, salvage operations may actually facilitate habitat recovery," particularly where "excessive amounts of course woody debris may interfere with stand regeneration activities following disturbances."

In sum, the record shows that the appellees have ensured compliance with the NWFP, basing the recovery project on a thorough consideration of the relevant factors. *Overton Park,* 401 U.S. at 416, 91 S.Ct. 814; *Ocean Advocates,* 402 F.3d at 859. Following the catastrophic Biscuit Fire that created literally tens of thousands of acres of dead wood, the Forest Service used site-specific information and historic data to analyze the measures needed for returning the burned forest back into one bearing LSR characteristics. The appellants have failed to show that the Forest Service's considered methodology for meeting the NWFP's standards is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[5]

## 2. The Recovery Project Sufficiently Considers Soil Guidelines as Required by the NFMA

■ Next, the appellants claim that the appellees have violated the NFMA because

4. For example, respecting the appellants' contention that the Forest Service has not sufficiently provided for the retention of snags, the FEIS (1) explains how the Forest Service followed each of the NWFP's salvage guidelines, (2) documents the minimal effects of the proposed salvage on snag retention, and (3) requires the retention of the largest and most persistent snags available in each salvage unit. Notably, more than 99 percent of the snags will remain after salvage is complete. No salvage will occur in areas exhibiting LSR habitat conditions. The FEIS notes that, before salvage, there are an estimated 21–33 snags per acre measuring 21–32″ dbh, and 8–16 snags per acre measuring greater than 32″ dbh. After the maximum salvage authorized, the FEIS estimates that there will be between 19.4 and 30.1 snags per acre measuring 21–32″ dbh and 7.3–14 snags per acre greater than 32″ dbh.

5. Before the district court, the appellants claimed that the Inventoried Roadless Area

Record of Decision ("IRA ROD") violated the 2001 Roadless Area Conservation Rule, which provided that "timber may not be cut, sold, or removed" from inventoried-roadless areas ("IRAs"), subject to limited exceptions that are not relevant to this case. 36 C.F.R. § 294.13. The appellants now admit that the rule was repealed in May 2005 and that their claim is moot even though they did not ask the district court to vacate its ruling on this issue. They, however, ask us to vacate the district court's ruling on their claim. But the district court did not decide whether the Forest Service violated the rule. Rather, the district court observed that the Forest Service was permanently enjoined nationwide from implementing the rule at the time the Forest Service issued the IRA ROD. Thus, the district court reasoned that the Forest Service was required to follow the requirements of the Siskiyou National Forest Plan, which rendered reasonable the Forest Service's decision to plan for activities in IRAs. Accordingly, we reject the appellants' vacatur request.

the recovery project is inconsistent with soil standard 7–2 of the Siskiyou National Forest Plan, which provides that when the Forest Service conducts land-management activities, the "total area of detrimental soil conditions should not exceed 15 percent of the total acreage within the activity area, including roads and landings." The FEIS describes the activity area as areas of "timber salvage or fuel treatment." According to the appellants, the recovery project is expected to cause a 36 percent ground disturbance.

The record does not support the appellants' contention that the recovery project will violate soil standard 7–2. The appellants' basis for suggesting that the recovery project will cause a 36 percent ground disturbance is a portion of the FEIS that recites general information and statistics on soil disturbance caused by various logging techniques employed after another fire, the 1987 Silver Fire. Moreover, the Forest Service included the 36–percent figure as the projected ground disturbance for only one specific kind of logging system, ground-based or tractor logging. The salvage plan, however, projects that such ground-based logging will be used on only 44 acres of the approximately 19,000–acre recovery area (less than a quarter of one percent of the project). Also, even assuming that areas managed contemporaneous to the time of the Silver Fire exceeded current soil standards, the FEIS mandates that the Forest Service must ensure that *"salvage and restoration will not increase the area of the disturbance and will be designed to move the area toward compliance"* (emphasis in original). The Forest Service was simply accounting for past ground disturbances in its analysis of soil conditions.

The record supports the district court's conclusion that the Forest Service demonstrated compliance with soil standard 7–2.

The Forest Service has undertaken extensive field studies targeted at the activity areas and has provided for extensive mitigation measures and monitoring requirements in all salvage-sale contracts. As the district court found, there is no evidence that the Forest Service will not employ the mechanisms that it says it will.

The appellants labor to draw a parallel between their case and this court's decisions in *Ecology Center v. Austin,* 430 F.3d 1057 (9th Cir.2005), and *Lands Council v. Powell,* 379 F.3d 738, 743 (9th Cir. 2004), *amended by* 395 F.3d 1019 (9th Cir.2005). Both decisions are inapposite to the circumstances presented here.

*Ecology Center* did involve a forest recovery project designed in the aftermath of wildfires. 430 F.3d at 1061. A conservation group challenged the Forest Service's soil-quality analysis, arguing that the Forest Service cannot allow an activity that would create detrimental soil conditions in 15 percent of the activity area. *Id.* at 1068. Specifically, the conservation group asserted that the methodology employed by the Forest Service to determine soil conditions was insufficiently reliable because the Service was estimating soil conditions without verifying those estimates by directly observing soil conditions in the activity areas. *Id.* We agreed, noting that the "failure of the Forest Service ... was that the soils analysis" included "no on-site inspection or verification." *Id.* at 1035. The evidence revealed that the Forest Service conducted very limited surveys of burned areas and that "the Forest Service's decision to authorize the Project first and verify [soil conditions] later" violated the NFMA. *Id.* at 1071. In reaching its decision, the court also relied on statements in the record from the Forest Service's own soil scientist criticizing the credibility of the soil analysis. *Id.* at 1069 n. 13, 1070 & n. 15.

The record here tells a very different story. In addition to post-fire testing, the Forest Service conducted extensive pre-EIS field reviews of more than 30 percent of the proposed salvage areas and has continued to conduct pre-implementation field surveys of *all* proposed salvage areas. More importantly, the FEIS explicitly states that the Forest Service relied on its field surveys conducted on soils within the actual salvage areas to assess compliance with soil standard 7–2. Thus, unlike *Ecology Center,* here, on-the-ground soil analysis preceded the FEIS. *Id.* at 1077. Moreover, the Forest Service has undertaken on-the-ground soil analysis *following* the issuance of the FEIS to ensure compliance with governing soil standards and the FEIS's predicted impacts on soil.

*Lands Council* also included a challenge to the Forest Service's analysis of disturbed soil conditions, claiming that the methodology used to calculate the amount of soil in a detrimental state was insufficiently reliable. 395 F.3d at 1034. We agreed because the record established that the Forest Service never sampled the soil in the activity area. *Id.* at 1035. Instead, based on samples from throughout the forest, and aerial photographs, the Forest Service estimated the quality of the soils in the project area using a spreadsheet model. *Id.* We determined that the Forest Service should have actually tested the land in the activity area, reasoning that the "Forest Service, and consequently the public at large, has no way to know whether the projection of the Project area's soils was reliable." *Id.* The soil analysis conducted by the Forest Service in the present case is starkly different from the methodology employed by the Forest Service in *Lands Council.* As noted, the record shows that the Forest Service based its soil analysis on actual field surveys, not on some model with no on-site inspection or verification.

The FEIS's evaluation of soils and planned mitigation efforts demonstrates that the Forest Service carefully evaluated the likely environmental consequences of the recovery project in reaching its conclusion that it would be consistent with soil standard 7–2. While the appellants have not identified any salvage area where soil standards have not or will not be met, the appellees have submitted hundreds of surveys demonstrating that the Forest Service analyzed each salvage area prior to any action and have ensured that the 15–percent standard is not violated. Accordingly, the record does not support the appellants' claim that the Forest Service's soil analysis was unreasonable.

### 3. The FEIS Complies with NEPA's Procedural Requirements to Sufficiently Address Opposing Scientific Views and Adequately Perform a Cumulative Effects Analysis for Past Actions and Wildlife

■ The appellants also challenge the recovery project under NEPA, contending that the FEIS violates NEPA by failing to disclose and address scientific evidence that contradicts the Forest Service's environmental analysis for the Recovery Project. Specifically, they argue that the FEIS fails to (a) address retention of dead trees greater than 20 inches in diameter, (b) consider certain reports, and (c) provide an adequate assessment of the cumulative impacts resulting from past forestry actions.

Under NEPA, the Forest Service must adequately consider and disclose the environmental impact of its actions. *See Am. Rivers v. FERC,* 201 F.3d 1186, 1194–95 (9th Cir.1999). NEPA imposes procedural rather than substantive requirements on the Forest Service. *See Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.,* 42 F.3d

517, 523 (9th Cir.1994) (per curiam) (citing *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)). Our task under NEPA is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions. *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.,* 126 F.3d 1158, 1183 (9th Cir.1997) (citing *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 97–98, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)). So long as "the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

(a) In support of their claim that the FEIS failed to disclose scientific opinions to retain dead trees greater than 20 inches in diameter, the appellants cite the 1992 Final Draft Recovery Plan for the Northern Spotted Owl ("1992 Plan"), a 1993 report by the Forest Ecosystem Management Assessment Team that addressed the issues raised in the then on-going spotted owl litigation ("1993 FEMAT Report"), and a 1993 report to which some Forest Service scientists contributed ("1993 SAT Report"). The appellants argue that they brought all three documents to the Forest Service's attention during the public-comment period on the draft EIS and that the FEIS violates NEPA because it "entirely fails to consider, respond to, or even mention the 20–inch limit on salvage in LSRs" discussed in the three publications.

To the contrary, the view that trees greater than 20 inches in diameter should not be salvaged was addressed in the draft EIS and continued to be addressed in the FEIS. Developed in response to scientists' recommendations, the FEIS included "alternative 4," which provides a 20–inch–diameter limit on the size of snags that could be salvaged.[6]

(b) The appellants' suggestion that the FEIS does not discuss the 1993 FEMAT report is inaccurate.[7] We have found at least five sections of Chapter III of the FEIS that discuss this report. *See* FEIS at III–155–57, III–204–05, III–260, III–287. The appellants, however, appear to be correct that the 1993 SAT Report is not covered by the FEIS, but they fail to explain the report's relevance to the recovery project. The report recommends that "no snags over 20 inches dbh be marked for cutting," but this recommendation is found in a section discussing harvest of *green* forest trees in relation to buffers for four bird species. The recovery project for the burned forest at issue does not

---

6. NEPA mandates that the agency provide a detailed statement regarding the alternatives to the agency's proposed action. 42 U.S.C. § 4332(2)(C)(iii). Consideration of reasonable alternatives is necessary to ensure that the agency takes into account all possible approaches to, and potential environmental impacts of, a particular project. "[A]n agency's consideration of alternatives is sufficient if it considers an appropriate range of alternatives, even if it does not consider every available alternative." *Headwaters, Inc. v. Bureau of Land Mgmt.,* 914 F.2d 1174, 1181 (9th Cir.1990).

7. Contrary to the appellants' assertion, this report did not recommend a 20–inch–diameter limitation, explaining instead that "following stand-replacing disturbances, management should focus on retaining snags that are likely to persist until [LSR] conditions have developed and the stand is again producing large snags." But even if the report had recommended a 20–inch–diameter limitation, the FEIS addresses the limitation in its discussion of "alternative 4," as already noted.

concern green forest trees and those bird species.

Additionally, the FEIS dedicates an entire section to the issue of "Scientific Uncertainty," describing the scientific debate relevant to the recovery project and identifying disagreements among scientists. The FEIS also devotes a complete appendix to formulating a study that will address the restoration of LSRs destroyed by the Biscuit Fire. The appendix describes the conflicting scientific viewpoints relating to alternative post-fire management approaches. Furthermore, the FEIS includes another appendix that discusses opposing scientific views and responds to views contradicting the recovery project. Thus, the district court properly concluded that the amount of inclusion of opposing scientific viewpoints within the FEIS is sufficient to show that the Forest Service fulfilled its requirements in this area under NEPA.

(c) The appellants also claim that when analyzing the impact of the Recovery Project, the FEIS violated NEPA by inadequately considering wildlife associated with LSR habitat and past actions in the recovery area. This court has recognized that "[c]umulative effects analysis requires the Final Environmental Impact Statement to analyze the impact of a proposed project in light of that project's interaction with the effects of past, current, and reasonably foreseeable future projects." *Lands Council*, 395 F.3d at 1027.

Our review of the record confirms the district court's conclusion that portions of the FEIS "addressed past management activities" and that the FEIS provides quantified information "regarding areas subjected to past management coincident with proposed salvage, and areas previously managed on federal lands[.]" We agree with the district court that the FEIS sufficiently discusses past management activities, especially when considering the extensive and catastrophic effect of the Biscuit Fire on vegetation, the limited amount of past timber harvest in the area planned for salvage, and the recovery project's overriding emphasis on aerial rather than ground-based logging.

The FEIS makes clear that the most important past event for purposes of evaluating cumulative impacts was the Biscuit Fire, which occurred in 2002. In addition to that fire, the FEIS discusses the effects of the 1987 Silver Fire. In addressing cumulative effects of past timber harvest, the FEIS notes that the "effects of much of the past management in the Recovery Area have been masked by, or subordinate to the effects of the wildfire." This explains why the FEIS's primary focus in analyzing past effects is on past fires and their associated post-fire management activities. The record illustrates beyond any doubt that the Biscuit Fire overshadowed the previous actions in the recovery area.[8] *See* 40 C.F.R. §§ 1500.1(b) ("Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail."), 1500.4(g) ("Agencies shall reduce excessive paperwork by: ... deemphasiz[ing] insignificant issues, narrowing the scope of the environmental im-

8. The appellants seem to suggest that NEPA requires a catalog of all past actions in the recovery area. This position seems at odds with the reality of the Biscuit Fire. There can be no doubt that the Biscuit Fire was of such a magnitude that it constituted an intervening past event, eclipsing most of the impact from past management activities. Accordingly, it is reasonable for the Forest Service to highlight the effects of the Biscuit Fire in conjunction with other relevant past actions to determine the best way of addressing the fire's devastation and managing the forest to avoid future devastating fires.

pact statement process accordingly[.]").[9]

In addition, the FEIS does more than just analyze past fires and the impacts and intensity of such fires on specific Siskiyou Forest acres. It also discloses past harvesting and the total acres of past harvest since 1980. The FEIS focuses on past logging activity since 1980 because "areas harvested before 1980 would have recovered to pre-harvest conditions," not to mention that most impacts from past harvests have been subordinated by the Biscuit Fire. Further, the FEIS specifically explains the nature of past activities (including pre–1989 "clearcutting") and acknowledges that past timber harvest may have "change[d] soil conditions by compaction or displacement, which can affect infiltration rates, soil structure, and amounts of large woody material left for soil protection and nutrient cycling." [10]

Accordingly, we conclude that the FEIS satisfies NEPA's procedural requirements. The appellees fully considered the camp of scientific opinion that there should be no harvest of large dead trees and, contrary to the appellants' claims, took a "hard look" at cumulative effects. *Idaho Sporting Cong.*, 305 F.3d at 963. Because a very small fraction of the salvage area was previously harvested, the FEIS appropriately concentrated a majority of its analysis on the impact of the most relevant past event, the Biscuit Fire. *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 761 (9th Cir.1996). We join the district court in determining that the FEIS "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *California v. Block*, 690 F.2d 753, 761 (9th Cir.1982).

### 4. The Appellants Are Not Entitled to an Injunction

Assuming that they succeed on the merits of their NWFP, NFMA, and NEPA claims, the appellants ask this court to issue an injunction that would prevent the appellees from moving forward with the recovery project. Under either of the two tests for injunctive relief in this circuit, the appellants must show the probability of success on the merits. *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319 (9th Cir.1994). Because we hold that the appellants do not prevail on the merits of their claims, we must deny their request for an injunction.

\* \* \* \* \*

For all of the foregoing reasons, the judgment of the district court is **AFFIRMED** and the appellants' injunction request is **DENIED**.

PREGERSON, Circuit Judge, concurring in part and dissenting in part.

I agree that the appellants have not demonstrated a likelihood of success on the merits of their action for injunctive relief *based on* the Northwest Forest Plan

---

9. Because "[o]nly *dead* trees are planned for commercial harvest," the district court reasoned that the FEIS would serve no relevant purpose by "catalog[ing] specific past timber management projects in areas proposed for salvage harvest in order to assess cumulative effects ... on *live* trees" (emphasis added).

10. Also lacking merit is the appellants' contention that the FEIS inadequately analyzes the cumulative effects for wildlife associated with LSR habitat. The FEIS provides an extensive discussion of potential impacts on wildlife and examines impacts of management activities on 56 species of concern, which are not limited to threatened and endangered species listed under the Endangered Species Act. The FEIS also explores the impacts of the Biscuit Fire and the proposed project activities on wildlife habitat. A conspicuous segment of this analysis zeroes in on the effects of past activities on various types of wildlife habitat.

and the National Environmental Policy Act's requirement that opposing scientific viewpoints be addressed. But I believe that the appellants have demonstrated a likelihood of success on the merits *based on* the soil standard requirements of the National Forest Management Act and the National Environmental Policy Act's requirement that an agency consider the cumulative impacts of past actions. Because I believe that this court should enjoin further harvesting of timber in the Biscuit Fire region that will harm the environment, I respectfully dissent.

## I.

Pursuant to the National Forest Management Act, the Forest Service developed a Land Management Resource Plan for the Siskiyou National Forest known as the Siskiyou National Forest Plan. As the majority sets forth, soil standard 7–2 of the Plan states: "The total area of detrimental soil conditions should not exceed 15 percent of the total acreage within the activity area, including roads and landings."

"An 'activity area' is a unit of forest in which an activity ... is to take place." *Ecology Ctr. v. Austin*, 430 F.3d 1057, 1068 n. 10 (9th Cir.2005). Thus, to comply with the soil standard requirement, the Forest Service must first identify each activity area, and then assure that the soil conditions in each activity area are not more than fifteen percent damaged. In *Ecology Center*, in which the soil standard was effectively identical to this one,[1] we noted that "if fifteen percent or more of the activity area already has detrimental soil conditions, then the Project will not be permitted to make it worse. Rather, the Project should then aim to improve the soil conditions." *Id.*

The majority assumes that the Forest Service accurately identified the proposed activity areas. It did not. The Forest Service defined the activity areas as "the total area of ground impacting activity [that] is a feasible unit for sampling and evaluating." This confusing definition does not enable the courts to determine the boundaries of a particular activity area, let alone whether the Forest Service is in compliance with the soil standard in the proposed activity area. Our cases make clear that we will not allow the Forest Service to base its soil analysis "on assumptions" not supported by actual "on-site spot verification." *See id.* at 1069; *see also Lands Council v. Powell*, 395 F.3d 1019, 1035 (9th Cir.2005) (finding inadequate a report that would require the court "to trust the Forest Service's internal conclusions" and methodologies on soil standards).

The majority asserts that *Ecology Center* and *Lands Council* are inapposite because they are factually distinct. In those cases, the Forest Service did not conduct actual soil analysis and instead based its conclusions on estimations and spreadsheet modeling. It is true that the facts of those cases differ slightly from this one because actual soil analysis occurred here, but the factual distinctions do not render those cases inapposite. Both cases involved soil standards testing in activity areas, and *Ecology Center* even involved post-fire harvesting and habitat restoration, like this case. *Ecology Center* and *Lands Council* stand for the proposition that unverifiable statements from the Forest Service about compliance with soil standards will not pass muster. This is a case in which we are again asked to accept

---

1. The Regional Soil Quality Standard in *Ecology Center* stated that the Forest Service "cannot allow an activity that would create detrimental soil conditions in fifteen percent of the activity area." *Ecology Center*, 430 F.3d at 1068.

the Forest Service's unverifiable assertion that it is in compliance with its own management rules.

It is clear to me that the appellants have made out a likelihood of success on the merits of their action for injunctive relief based on noncompliance with soil standard 7–2. The majority's interpretation fails to recognize that the Forest Service has inadequately identified the activity areas for its harvest.

## II.

As the majority notes, the National Environmental Policy Act requires the Forest Service to adequately identify and evaluate the adverse environmental effects of a proposed action. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). As part of that assessment, the Forest Service must assess cumulative impacts: the impact of the proposed project in light of the effects of "past, current, and reasonably foreseeable future projects." *Lands Council,* 395 F.3d at 1027. Because I conclude that the Forest Service did not adequately assess the cumulative impacts of past logging activities in the recovery area, I would hold that the Final Environmental Impact Statement violates the National Environmental Policy Act.

The Forest Service and the majority place great emphasis on the fact that the Biscuit Fire was "extensive and catastrophic." The majority determines that the fire was an "intervening past event" that reduces the requirement that the Forest Service assess the impacts of past logging activity. While there is no doubt that the Biscuit Fire is the most important past event in the area, the National Environmental Policy Act does not relax the cumulative impacts requirements if a fire has occurred. It is improper for the majority to rely on an "intervening past event" to permit the Forest Service to violate the law. While it is true that the Forest Service disclosed past harvesting and the total acres of past harvest, the Forest Service declined to then analyze the impacts of the past harvest on the environment.

For the foregoing reasons, I would hold that the appellants have made out a likelihood of success on the merits based on the soil standard requirements of the National Forest Management Act and the National Environmental Policy Act's requirement that an agency consider the cumulative impacts of past actions. Accordingly, I respectfully dissent.