**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OREGON NATURAL RESOURCES
COUNCIL FUND; SIERRA CLUB, a
California nonprofit corporation;
HEADWATERS, an Oregon nonprofit
corporation,
　　　　　*Plaintiffs-Appellants,*

　　　　　and

ERIC NAVICKAS,
　　　　　*Plaintiff,*

　　　　　v.

LINDA GOODMAN, Regional
Forester, Pacific Northwest
Region, U.S. Forest Service;
UNITED STATES FOREST SERVICE, a
federal agency,
　　　　　*Defendants-Appellees,*

MOUNT ASHLAND ASSOCIATION, dba
Ski Ashland,
　　　　　*Defendant-intervenor-*
　　　　　　　　　*Appellee.*

No. 07-35110

D.C. No.
CV-05-03004-PA

OPINION

Appeal from the United States District Court
for the District of Oregon
Owen M. Panner, Senior District Judge, Presiding

Argued and Submitted
July 11, 2007—Portland, Oregon

Filed September 24, 2007

Before: Stephen Reinhardt, Cynthia Holcomb Hall, and
Milan D. Smith, Jr., Circuit Judges.

13051

Opinion by Judge Milan D. Smith, Jr.

**COUNSEL**

Marianne Dugan, Eugene, Oregon, for the plaintiffs-appellants.

Robert J. Lundman, United States Department of Justice, Washington, D.C., for the defendants-appellees.

Robert A. Maynard, Perkins Coie LLP, Boise, Idaho, for the defendant-intervenor-appellee.

**OPINION**

MILAN D. SMITH, JR., Circuit Judge:

Appellants Oregon Natural Resources Council, the Sierra Club and Headwaters (collectively, ONRC) challenge the United States Forest Service's (Forest Service) approval of the proposed expansion of the Mount Ashland Ski Area (MASA), located in Oregon's Siskiyou Mountains within the Rogue River and Klamath National Forests. The district court granted summary judgment in favor of the Forest Service, finding it had not violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, or the National Forest Management Act (NFMA), 16 U.S.C. § 1600 *et seq.*, in authorizing the MASA expansion. We hold that the Forest Service failed to properly evaluate the impact of the proposed MASA expansion on the Pacific fisher, in violation of both the NEPA and the NFMA, and that it violated the NFMA by failing to appropriately designate Riparian Reserves and Restricted Watershed terrain, as required by the Rogue River

National Forest Land and Resource Management Plan (Rogue River LRMP) and the Northwest Forest Plan (NWFP). Accordingly, we reverse the district court's grant of summary judgment in favor of the Forest Service and remand to the district court for issuance of the injunction specified in this opinion.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

MASA is a ski resort located approximately seven air miles south of the City of Ashland, Oregon. The Mount Ashland Association (MAA) operates MASA under a special use permit issued to the City of Ashland by the Forest Service. The City of Ashland, in turn, leases the ski area to the MAA.

For over twenty years, MAA and the Forest Service have explored the possibility of expanding MASA so as to accommodate beginner and intermediate skiers and snowboarders, as well as tubing and other facility upgrades, in an effort to ensure the ski area's long-term economic viability. In 1991, the Forest Service released a Final Environmental Impact Statement and Record of Decision approving the general expansion of the ski area, but not addressing the specifics of any plan. In 1998, MAA submitted a detailed, proposed expansion plan to the Forest Service. The Forest Service subsequently solicited public comment concerning the proposed project, and in 2000 and 2003 released draft Environmental Impact Statements (EIS). During the comment periods, the Environmental Protection Agency and members of the public expressed concerns about the proposed project's possible effects on erosion and sedimentation, bio-diversity, watershed resources and water quality. Concern was also voiced about the proposed expansion's possible impact on the Pacific fisher, a small carnivore related to the mink, otter and marten that inhabits certain old-growth forests, and other wildlife species.

In August 2004, the Forest Service released a Final Environmental Impact Statement (FEIS) in which it analyzed six expansion alternatives. Alternative 2 and Alternative 6 are the only two expansion alternatives relevant to this appeal. Alternative 2 contemplates the MAA constructing two new chairlifts and two new surface lifts, clear-cutting seventy-one acres for new ski runs, and clearing four additional acres for lift corridors and staging areas, primarily within the western half of the special use permit area. The proposed ski run development would require the removal of approximately sixty-eight acres of trees, which would generate 1,822 board feet of commercial grade timber. Additionally under Alternative 2, watershed restoration projects would be implemented, including structural storm water control and non-structural controls, such as the controlled placement of woody material. Alternative 6, which is a variant of Alternative 2, envisions limiting the environmental consequences of expansion in the Middle Fork area by requiring MAA to use a lightweight, low ground pressure machine to clear ski runs and lift runs. Alternative 6 would permit MAA to construct two chairlifts and two surface lifts and to clear approximately sixty-five acres of new ski run terrain.

In September 2004, the Forest Service issued the Record of Decision (ROD) for the MASA expansion, selecting Alternative 2 with some modifications adopted from Alternative 6. It concluded that Alternative 2 would help ensure MASA's long-term economic viability, with acceptable physical, biological and human environmental consequences. The Forest Service received twenty-eight notices of appeal to the ROD. Among these was an appeal from Eugene Wier, a wildlife biologist who had been employed by the Forest Service, detailing his concern regarding the expansion's impact on the Pacific fisher. In December 2004, the Forest Service denied all administrative appeals to the ROD.

In January 2005, ONRC filed suit against the Forest Service and Regional Forester Linda Goodman seeking declara-

tory and injunctive relief on the grounds that the MASA expansion project violated both the NEPA and the NFMA. Specifically, ONRC contends that the Forest Service failed: (1) to ensure the viability of the Pacific fisher, a sensitive species; (2) to adequately consider and disclose the direct and cumulative impacts on the Pacific fisher; (3) to analyze whether the expansion will comply with wetlands laws; (4) to adhere to Rogue River LRMP and NWFP standards and guidelines for protecting watersheds and riparian areas; (5) to disclose a potentially high rate of error in the model that it used to estimate sediment impacts on the municipal watershed; and (6) to adequately disclose cumulative water quality impact by utilizing a computer model without disclosing its flaws, rather than cataloging and analyzing specific projects.

On February 9, 2007, after considering cross-motions for summary judgment, the district court entered summary judgment against ONRC. The court found that the Forest Service's disclosure of potential erosion and water quality impacts in the FEIS complied with the NEPA, and that the Forest Service did not violate the NEPA or the NFMA by failing to discuss compliance with applicable laws governing wetlands in the FEIS. It also found the Forest Service's failure to classify Land Hazard Zone 2 terrain as Riparian Reserve was harmless and concluded that the proposed expansion satisfied the principal Rogue River LRMP and NWFP requirements for land designated Restricted Watershed and Riparian Reserve. Lastly, the district court held that ONRC's allegations regarding the Pacific fisher "mostly rely on extra-record materials that I have stricken, and events that post-date final approval of the ROD." ONRC filed a timely notice of appeal from the district court's judgment. We granted a stay of the district court's judgment for the duration of this appeal.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291, and review the district court's grant of summary judgment de

novo. *Lands Council v. Powell,* 395 F.3d 1019, 1026 (9th Cir. 2005) (citing *Covington v. Jefferson County*, 358 F.3d 626, 641 n.22 (9th Cir. 2004)). "Agency decisions that allegedly violate [the] NEPA and [the] NFMA are reviewed under the Administrative Procedure Act ('APA'), and may be set aside only if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1008-09 (9th Cir. 2006) (quoting 5 U.S.C. § 706(2)(A)). Although our review under this standard is deferential, the agency must nonetheless "articulate a rational connection between the facts found and the conclusions made." *Or. Natural Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997) (citing *United States v. La.-Pac. Corp.*, 967 F.2d 1372, 1376 (9th Cir. 1992)). Moreover, if an agency "fails to consider an important aspect of a problem . . . [or] offers an explanation for the decision that is contrary to the evidence," its action is "arbitrary and capricious." *Lands Council*, 395 F.3d at 1026 (citing *Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

We review a district court's decision to exclude extra-record evidence for abuse of discretion. *Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1133 (9th Cir. 2006).

## DISCUSSION

A.   Statutory Background

1.   *National Environmental Policy Act*

The NEPA mandates that covered governmental entities take a "hard look" at the environmental consequences of certain proposed actions. *Lands Council*, 395 F.3d at 1027. The NEPA requires federal agencies to prepare an EIS for "major Federal actions significantly affecting" the environment. 42 U.S.C. § 4332(2)(C). An EIS is a thorough analysis of the potential environmental impacts that "provide[s] full and fair

discussion of significant environmental impacts and . . . inform[s] decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1; *see also Lands Council v. McNair*, 494 F.3d 771, 777 (9th Cir. 2007).

2.   *National Forest Management Act*

The NFMA imposes constraints on the Forest Service's management of national forests. *See* 16 U.S.C. §§ 1600-87; *see also Ecology Ctr., Inc. v. Austin*, 430 F.3d 1057, 1062 (9th Cir. 2005). Procedurally, it requires the Forest Service to develop a land and resource management plan, also referred to as a "forest plan," for each forest it manages. 16 U.S.C. § 1604(a). The NFMA also requires that a forest plan "provide for diversity of plant and animal communities," *id.* § 1604(g)(3)(B), and that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area," 36 C.F.R. § 219.19 (2000); *see also Envtl. Prot. Info. Ctr.*, 451 F.3d at 1017. Any action taken by the Forest Service in a managed forest must comply with the NFMA and must also be consistent with the governing forest plan. *See Ecology Ctr.*, 430 F.3d at 1062.

B.   The Pacific Fisher

1.   *NFMA Claim*

[1] The Forest Service designated the Pacific fisher a "sensitive species" due to substantial population declines and the possibility that the fisher could be listed as an "endangered species" pursuant to the Endangered Species Act. *See* Endangered and Threatened Wildlife and Plants; 12-month Finding for a Petition to List the West Coast Distinct Population Segment of the Fisher, 69 Fed. Reg. 18770, 18770 (April 8, 2004) (to be codified at 50 C.F.R. pt 17) (finding that the Pacific

fisher warrants protection as an endangered species under the Endangered Species Act of 1973). Under the Rogue River LRMP, species classified as "sensitive" must be managed by the Forest Service to ensure that they do not become threatened or endangered due to management activities. The Rogue River LRMP requires that where sensitive species occur in lands categorized as "Developed Recreation," "the Biological Evaluation process . . . will be used during project planning to display the effects of proposed activities . . . [and] [w]here such species are present, field evaluation data will be used to determine the effects and recommend measures to ensure that species viability is not jeopardized." The Biological Evaluation is a five-step process which requires the Forest Service to conduct: "a) [a] [p]re-field review of existing information; b) [f]ield reconnaissance of the project area; c) [d]etermination of whether local populations listed and PETS species will be affected by a project; d) [a]nalysis of significance of project effects on local and total populations of listed and PETS species; e) [w]hen step four cannot be completed due to lack of information, a biological or botanical investigation is conducted to gather the information needed to complete step four." ONRC contends that the Forest Service violated the NFMA by failing to abide by the Rogue River LRMP's requirement that it conduct a compliant Biological Evaluation to determine the impact of the proposed MASA expansion on the Pacific fisher. We agree and conclude that the Forest Service's evaluation of the Pacific fisher in the MASA expansion area does not comply with the requirements of the Rogue River LRMP and, therefore, violates the NFMA.

[2] In 1999, Forest Service biologists prepared a Biological Evaluation for the MASA expansion, which concluded that there was no suitable fisher habitat within the proposed project area and that no impact on fisher or fisher habitat was expected. However, in 2001 and 2002, Eugene Wier, a Forest Service field biologist, identified Pacific fisher within the project area. Wier noted that the Pacific fisher's presence on Mount Ashland represented the furthest east and the highest

elevation at which Pacific fisher had been found within the Siskiyou Mountains. Despite Wier's observations, the Forest Service did not update or amend its 1999 Biological Evaluation. The Forest Service addressed Wier's discovery of the Pacific fisher within the expansion area in the 2004 FEIS by concluding that the project posed no threat to the Pacific fisher because the expansion will impact less than one percent of the similarly forested land within three miles. This conclusion is based on an analysis of habitat in the proximity of the project area rather than documented local and total fisher populations.

**[3]** We find that in this instance the Forest Service's use of habitat as a proxy for population violated the NFMA. We have recently explained that species viability may be met by estimating and preserving habitat "*only* where *both* the Forest Service's knowledge of what quality and quantity of habitat is necessary to support the species *and* the Forest Service's *method for measuring the existing amount of that habitat are reasonably reliable and accurate*." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1175-76 (9th Cir. 2006) [hereinafter *Earth Island II*] (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1250 (9th Cir. 2005)) (emphasis added).

In *Earth Island II*, we examined whether the Forest Service appropriately relied on habitat monitoring for determining populations trends of the black-backed woodpecker. *Id.* at 1175. Although the Forest Service's final environmental impact statement "discuss[ed] various studies of black-backed woodpeckers that confirm[ed] their preference for burned forest habitat" and presented tables listing areas in the project area "assumed to provide high and moderate capability habitat," we concluded that "[t]here is no indication that the USFS consulted current or accurate field studies to arrive at these numbers, and there is no identification of the methodology used in determining what constitutes suitable habitat." *Id.*

**[4]** We find the Forest Service's analysis of the quantity and quality of the fisher habitat similarly devoid of supporting or explanatory data. In its 2004 FEIS, the Forest Service stated that "[o]f the land within three miles of the S[pecial] U[se] P[ermit] area, 10,200 acres are in a condition class similar to the forested site where the fisher was photographed. The 68 acres of forested area that would be removed if Alternative 2 . . . is implemented, amount to .7% percent of the available acres [of] habitat within three miles."[1] But other than commenting that it was similar to the environment in which the fisher was actually found, the Forest Service offered little explanation of its methodology for classifying the 10,200 acres in question as suitable fisher habitat.

Furthermore, the 2004 FEIS explicitly states that "ecological relationships between fisher and habitat are largely unknown" and "[t]he use of habitat per seasonality and topography is currently unknown in the S[pecial] U[se] P[ermit] area." Additionally, statements by two Forest Service biologists, Eugene Wier and William Zilinski, reveal that the Forest Service had insufficient data and knowledge regarding (1) the population of the Pacific fisher, and (2) the quantity and quality of habitat preferred by the Pacific fisher to justify using habitat as a proxy for population. Specifically, Wier observed that the Forest Service "know[s] nothing about how many individuals there are (within the Ashland Watershed or in the greater population), where they nest, how large their home ranges are, and what constitutes the core habitat within the greater Ashland Watershed upon which these individuals depend for future survival." Zilinski stated that the documented fisher's purpose in the expansion area was unknown: "was it just foraging, investigating denning sites, or exploring for new territory?"

---

[1]"The FEIS also noted that overall, '[t]he Mt. Ashland LSR [Late-Succession Reserve] has nearly 15,000 acres of high quality late-successional habitat.' "

**[5]** Thus, given the dearth of information about the local fisher population generally and the Forest Service's failure to explain adequately how it identified suitable fisher habitat, we hold that the Forest Service's habitat analysis was insufficient to satisfy the demands of the Rogue River LRMP Biological Evaluation process, and is in violation of the NFMA.**²**

### 2.   NEPA Claims

ONRC also argues that the Forest Service violated the NEPA when it failed (1) to disclose the potential impact of displacing the fisher and damaging habitat in the corridor linking the Klamath-Siskiyou region and the Southern Cascades, and (2) to discuss the effect future projects in the MASA expansion area would have on the Pacific fisher. We agree with ONRC.

**[6]** In *Marble Mountain Audubon Society v. Rice*, 914 F.2d 179 (9th Cir. 1990), we held that the Forest Service's failure to discuss the importance of maintaining a biological corridor in the Klamath National Forest violated the NEPA. *Id.* at 182. We explained that "[a]lthough the FEIS acknowledges that the Grider [Creek] drainage is a biological corridor, it does not contain significant discussion of the corridor issue." *Id.* Here, we are presented with a similar problem. In this case, the Forest Service acknowledged that there is a biological cor-

---

**²**Although we hold that the district court erred in finding the Forest Service complied with the Rogue River LRMP Biological Evaluation process, we conclude that it did not abuse its discretion in striking Eugene Wier's declaration because his concerns and criticisms of the MASA expansion with respect to the Pacific fisher were already presented in his administrative appeal of the ROD. Wier's declaration is not necessary (1) to determine whether the Forest Service considered all relevant factors and explained its decisions; or (2) to explain technical terms or complex subject matter and, therefore, does not fall within the exceptions to the rule limiting "[j]udicial review of an agency decision . . . to the administrative record in existence at the time of the decision." *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996).

ridor linking the Klamath-Siskiyou region and the Southern Cascades, and concluded that the expansion would have an inconsequential effect on the fisher. The Forest Service failed to meaningfully substantiate this finding.

[7] The Forest Service attempts to distinguish *Marble Mountain* on the basis that any impact on the biological corridor would be minimal because MASA's expansion would impact less than thirty-seven acres of the biological corridor, whereas in *Marble Mountain* more than 3,000 acres of the biological corridor were at risk. We are not persuaded. While the number of acres at risk here is certainly less than that in *Marble Mountain*, the Forest Service has nonetheless failed to disclose the methodology it employed to determine that the expansion's impact on the fisher would be inconsequential. Merely disclosing the existence of a biological corridor is inadequate. *Id.* Where the Forest Service concludes that a project will not jeopardize a wildlife corridor, it must support that conclusion with at least some study or analysis of how the reduced corridor will affect the species at issue. *Id.*

Turning to ONRC's second NEPA claim, federal law requires that an EIS must analyze "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7; *see also* 40 C.F.R. § 1508.25. A necessary component of NEPA's "hard look" is "a sufficiently detailed catalogue of past, present, and future projects, and [ ] adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment." *Lands Council*, 395 F.3d at 1027-28.

[8] The Forest Service's 2004 FEIS violates the NEPA because it fails to adequately discuss the impact on the Pacific fisher of two future projects: (1) the construction of nine miles of new logging roads within three miles of the project area, which will require the cutting of approximately 4,250 acres on

the south side of Mount Ashland and (2) a habitat restoration and fuel hazard reduction treatments, which include controlled fires. The FEIS simply states that "[n]o adverse cumulative effects are anticipated. The only future project[s] anticipated near the S[pecial] U[se] P[ermit] area are the Ashland Watershed Protection Project, and Ashland Forest Resiliency, which is [sic] not likely to affect fisher (minimal associated human use/disturbance)."

The Forest Service argues that it did not have to detail these projects' impact on the fisher because the ski area expansion is modest. We reject this justification. We have repeatedly explained that generalized, conclusory assertions from agency experts are not sufficient; the agency must provide the underlying data supporting the assertion in language intelligible to the public. *See Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864 (9th Cir. 2005); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 996 (9th Cir. 2004). "[W]hile the conclusions of agency experts are surely entitled to deference, NEPA documents are inadequate if they contain only narratives of expert opinions." *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 996. More specifically, the NEPA explicitly requires a cumulative impact analysis. A particular action may seem unimportant in isolation, but that small action may have dire consequences when combined with other actions. As we observed in *Klamath-Siskiyou Wildlands Center*, "[s]ometimes the total impact from a set of actions may be greater than the sum of the parts. For example, the addition of a small amount of sediment to a creek may have only a limited impact on salmon survival, or perhaps no impact at all. But the addition of a small amount here, a small amount there, and still more at another point could add up to something with a much greater impact, until there comes a point where even a marginal increase will mean that *no* salmon survive." *Id.* at 994 (emphasis in original).

We cannot excuse the Forest Service from the NEPA requirement to include an adequate cumulative impact analy-

sis in the 2004 FEIS. Two future projects, the Ashland Forest Resiliency Project (a logging project), and the Ashland Watershed Protection Project (a habitat restoration and fuel reduction project), are scheduled to occur in the vicinity of the proposed MASA expansion. Though the Forest Service generally addressed the impact of these projects elsewhere in the FEIS, it failed to discuss in detail their impact upon the fisher as part of the cumulative impact analysis required by NEPA. *See Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1306-07 (9th Cir. 2003) (holding that a cumulative impact analysis violated NEPA when a FEIS did not assess the role of foreseeable future projects on remaining suitable spotted owl habitat in a nearby home range core area within close proximity to the project's area).

## C.   Riparian Reserves and Restricted Watershed Terrain

[9] We next turn to ONRC's claim that the Forest Service violated the NFMA by failing to appropriately designate "Riparian Reserves" and "Restricted Watershed" terrain as required by the Rogue River LRMP and the NWFP. The rules governing the Forest Service's designation and management of Riparian Reserves and watersheds are complex and overlapping. The principal source of these rules is the NWFP itself, and, derivatively, the Aquatic Conservation Strategy (ACS) adopted pursuant to the NWFP. Under the ACS, Riparian Reserves are essentially buffer zones along streams, lakes, wetlands, and mudslide-risk areas, and "watersheds" are aquatic habitats or other hydrologically important areas. *See Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1031-32 (9th Cir. 2001). Recognizing that riparian terrain "offer[s] core areas of high quality stream habitat," and that watersheds "are crucial to at-risk fish species and stocks and provide high quality water," the ACS standards and guidelines "prohibit or regulate activities in Riparian Reserves that retard or prevent attainment of the Aquatic Conservation Strategy objectives."

The Forest Service must, however, comply with more than just the NWFP's ACS. When the NWFP was enacted, it did not completely displace existing forest management plans. In addition to setting out its own standards and guidelines, the NWFP also provides that the standards and guidelines of the pre-existing individual forest management plans—including the Rogue River LRMP— remain effective "where they are more restrictive or provide greater benefits to late-successional forest related species." Accordingly, the Forest Service must also comply with the Rogue River LRMP's more restrictive standards and guidelines for lands designated Restricted Riparian, Management Strategy 26 (MS 26) and for lands designated Restricted Watershed, Management Strategy 22 (MS 22). These standards and guidelines include the protection of all terrain within 100 feet horizontal distance of perennial streams, wetlands and associated riparian vegetation (Restricted Riparian MS 26) and all acres "designated as suitable for Municipal Supply Watershed" (Restricted Riparian MS 22). These guidelines further provide that "[w]hen conflicts exist between watershed management and other resources, the conflict will be resolved in the favor of the watershed resource."

Designation of land as Riparian Reserve has significant consequences for the management of that land. Specifically, the Rogue River LRMP mandates that management activities in Riparian Reserves should not exceed:

a) 20% mineral soil exposed on soils classed as very slight, slight, or low or moderate erosion hazard soils;

b) 10% exposure on high or severe erosion hazard soils;

c) 7% exposure on very high or very severe erosion hazard soils.

Pursuant to the NWFP, ACS Standard and Guideline WR-3 further prohibits the Forest Service from "us[ing] mitigation or planned restoration as a substitute for preventing habitat degradation" within Riparian Reserves, and explains that "[p]riority must be given to protecting existing high quality habitat" rather than compensating "for management actions that degrade existing habitat" through mitigation and restoration.

Designation of land as Restricted Watershed terrain also has significant consequences. The Rogue River LRMP includes specific soil disturbance standards and guidelines for areas designated as Restricted Watershed terrain and requires that management activities on Restricted Watershed MS 22 lands not exceed: "a) [f]orty percent mineral soil exposed on soil classed as very slight, slight, low or moderate erosion hazard soils; b) [t]hirty percent exposure on high or severe erosion hazard soils; c) [f]ifteen percent exposure on very high or very severe erosion hazard soils."

1.   Riparian Reserves

The NWFP assigns the Riparian Reserve designation to streams, ponds, lakes, and wetlands, including a buffer around these waterways. Pursuant to the ACS, (and thus the NWFP), lands that are "potentially unstable" must be designated and managed as Riparian Reserve. Using a "Landslide Hazard Zone" technique to assess geologic stability in the 2004 FEIS, the Forest Service divided project terrain into four hazard zones, wherein Landslide Hazard Zone 1 (LHZ 1) encompassed the highest risk terrain, and Landslide Hazard Zone 4 (LHZ 4) encompassed the lowest risk terrain. It designated LHZ 1 land as Riparian Reserve, but exempted LHZ 2 land from this designation.

ONRC contends that (1) the Forest Service's failure to designate the LHZ 2 land as Riparian Reserve violated the NFMA because its finding that the land was not "potentially

unstable" is contradicted by record evidence, and (2) this failure to make an appropriate designation resulted in further violations of the Rogue River LRMP, the NWFP (and ACS), and the NFMA, because a proper designation as Riparian Reserve would compel specific management practices to ensure that the terrain is appropriately protected. We agree. Evidence in the record clearly shows that debris flow landslides persistently originate from LHZ 2 lands. The 2004 FEIS found that LHZ 2 "is the second highest risk terrain" and concluded that the risk of landslides in LHZ 2 is "moderate to high" and the "sediment delivery potential" is "high." Therefore, the Forest Service has failed to demonstrated that LHZ 2 areas are not "potentially unstable."

[10] The district court sought to avoid this conclusion by reasoning that "[o]ne cannot make an omelet without breaking a few eggs. The other action alternatives evaluated in the 2004 FEIS would impact fewer acres of land classified LHZ 1 or LHZ 2. However, the Forest Service decided that the preferred alternative will better meet the purpose and need of the expansion project." We disagree. "It is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005). The Rogue River LRMP contains Riparian Reserve requirements and the ACS explicitly requires that "[w]atershed analysis and appropriate NEPA compliance is required to change Riparian Reserve Boundaries in all watersheds," but the Forest Service failed to comply with those requirements. By failing to designate the LHZ 2 terrain as Riparian Reserve, the Forest Service violated the NWFP, the Rogue River LRMP, and the NFMA. Whether the acreage at issue is relatively large or small is irrelevant to this inquiry—relevant law contains no *de minimis* exceptions.

2.   Restricted Watershed Terrain

When the 1991 MASA Master Plan was approved, approximately thirty-five acres of land designated as Restricted

Watershed MS 22 was included in the Special Use Permit area. In a 1998 letter discussing a MAA proposal to expand MASA, the Forest Service stated that an amendment was required to reclassify Restricted Watershed MA 22 land included in the Special Use Permit area as Developed Recreation Management Strategy 4 (MS 4) and indicated that "[t]his will be accomplished with Forest Plan Amendment 8." A statement acknowledging the need "to adjust the management allocation boundary from the 1990 Rogue River Forest Land and Resource Management Plan" was thereafter published in the Federal Register. Notices Dept. of Agriculture, Forest Service, Mount Ashland Ski Area Expansion, Rogue River National Forest, Jackson County, Oregon, 64 Fed. Reg. 55228, 55229 (Oct. 12, 1999). In 2000, the Forest Service confirmed the existence of Restricted Watershed MS 22 land within the expansion area and the need for an amendment to the 2000 draft EIS, when it stated that "[t]his adjustment changes (reduces) approximately 35 acres of Restricted Watershed (as mapped in LRMP Alternative K), and re-allocates to Developed Recreation, accounting for the 1991 expanded ski permit area boundary. The Developed Recreation allocation associated with this area will increase from 870 to 905 acres." The 2003 draft EIS also maintained that "[a]llocations associated with the 1990 [Rogue River National Forest] LRMP and the Mt. Ashland Ski Area primarily involved Developed Recreation [MS 4], and Restricted Watershed [MS 22]." However, in the 2004 FEIS, the Forest Service asserted that the 1994 NWFP "amended" existing Rogue River LRMP designations to "Administratively Withdrawn (Special Management)" and states that "this allocation is complimentary to the Developed Recreation R[ogue] R[iver] LRMP allocation." We find no explanation in the record that would resolve the conflict between this statement and the Forest Service's post-1994 statements concerning its intention to reallocate by means of "Forest Plan Amendment 8."

[11] The district court correctly determined that part of the ski area retains the Restricted Watershed MS 22 designation,

but nevertheless found that "the Forest Service necessarily intended" to depart from the Rogue River LRMP "when it conceptually approved the expansion in 1991, and approved the site-specific proposal in 2004." ONRC asserts that the district court erred in its holding because the NFMA clearly prohibits a departure from the forest management plan without a plan amendment. We concur. Because there is no amendment to the Rogue River LRMP in the record permitting the contemplated change to the Watershed, the Forest Service violated the NFMA by failing to ensure that the expansion will comply with the Rogue River LRMP standards and guidelines for Restricted Watershed MS 22 terrain.

3. New Developed Recreation Site

ONRC also contends that the Forest Service violated the Rogue River LRMP and the NFMA by authorizing development facilities that will affect currently undeveloped riparian habitat in the Middle Fork. ONRC argues that the Rogue River LRMP explicitly prohibits "new developed recreation sites" on Riparian Reserves. Emphasizing that the ski area construction began in 1963, the Forest Service asserts that the project is not a "new" recreation site but the expansion of an existing site, and that the Riparian Reserve restriction does not apply. We agree with the Forest Service.

[12] In addition to being fully supported by the Riparian Reserves language of the Rogue River LRMP, this conclusion is also fully consistent with treatment of this issue in the Restricted Watershed terrain portion of the Rogue River LRMP. In the standards and guidelines for Restricted Watershed MS 22, the Rogue River LRMP provides that "[n]ew developed recreation sites will not be constructed. Expansion of existing recreation sites will be analyzed in project environmental analysis." While the second sentence does not appear in the standard and guidelines for Riparian Reserve MS 26, the two treatments are consistent and there is no reason to treat them differently. We therefore hold that the term

"new" is intended to have a uniform meaning throughout the Rogue River LRMP and that the prohibition therein of new developed recreation sites in Riparian Reserves does not apply to the MASA expansion.

## D. Remaining Claims

**[13]** Lastly, we hold that the district court did not err in ruling for the Forest Service on all of the remaining claims raised by ONRC in its motion for summary judgment.

We hold that the Forest Service did not violate the NEPA requirement that the 2004 FEIS discuss or analyze potential violations of all federal, state and local laws, which include Oregon state wetland laws and regulations. The Forest Service included in the FEIS a discussion of whether the proposed expansion would violate federal and state laws, and explicitly noted that state and local agencies would have regulatory responsibilities for many activities and actions in the expansion project. Although the FEIS does not specifically address Oregon's unique regulatory program for wetlands, the FEIS is clear that state approval is a condition of the project. Thus, it would be "fly speck[ing]" to find a NEPA violation on these grounds, and we decline to do so. *See Ecology Ctr.*, 430 F.3d at 1077.

Second, we find that the Forest Service's FEIS adequately disclosed the shortcomings in the Water Erosion Prediction Project (WEPP) models used to estimate sediment impacts on the municipal watershed and, therefore, complied with NEPA. The NEPA does not require the reviewing court to "decide whether an [EIS] is based on the best scientific methodology available," *Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 496 (9th Cir. 1987) (quoting *Friends of Endangered Species v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985)) (alteration in original); rather the question is whether the FEIS adequately disclosed the model's potential weakness. We agree with the district court that it did. In Appendix H to the FEIS, the Forest

Service outlined several limitations of the WEPP model: its failure to account for the higher erosion rates that typically occur during the first two years after disturbance; the fact that its components are reasonably effective on the agricultural rangelands for which the WEPP model was designed, but that it has limitations when applied to forest lands; and the fact that no watershed template is currently available. Thus, because the NEPA requires adequate disclosure, not the best scientific methodology available, we hold that the Forest Service made adequate disclosures concerning the WEPP model's shortcomings.

**[14]** Finally, the Forest Service relied upon another computer model, the Equivalent Roadless Area (ERA) model, to address cumulative watershed effects. ONRC asserts that the Forest Service violated the NEPA by using the ERA model to assess the cumulative impacts of the proposed project when taken together with past projects in the affected area. The ERA model simulates the current condition of the terrain in the watershed which reflects the impact of past projects, and the FEIS describes the ERA methodology and the results of the analysis in detail. Because we do not question the methodology, but "defer[ ] instead to the agency's expertise in developing the model," an analysis that "consider[s] cumulative watershed effects and provide[s] a significant amount of quantified and detailed information" satisfies the NEPA. *Envtl. Prot. Info. Ctr.*, 451 F.3d at 1014 (citation omitted). Accordingly, we find that the Forest Service did not violate the NEPA by using the ERA model to analyze the cumulative watershed impact of the MASA expansion.

E.    Injunctive Relief

We have noted in other contexts that, "where the question of injunctive relief raises intensely factual issues, the scope of the injunction should be determined in the first instance by the district court." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001) (internal quotation marks

and citation omitted). But where, as here, "there are no such intensely factual issues and the scope of the injunction to which [the plaintiff] is entitled is quite plain," we may "decide the injunction question on this appeal." *Id.* at 739. "To determine whether injunctive relief is appropriate, 'even in the context of environmental litigation,' we apply 'the traditional balance of harms analysis.' " *Id.* at 737 (quoting *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1496 (9th Cir. 1995)). In this case, we conclude that ONRC has shown the potential for irreparable harm to the Pacific fisher should the project continue. The MASA expansion would result in eliminating habitat that may be vital to the preservation of the fisher population in the project area. Until the Forest Service conducts a proper Biological Evaluation establishing the size of the local fisher population and its relationship to its habitat, there remains a "sufficient possibility of environmental harm" to justify injunctive relief. *Id.* at 738.[3]

Similarly, until the Riparian Reserve and Restricted Watershed lands are properly classified and subjected to the additional scrutiny required by these classifications, the possibility of environmental harm to the ecological health of the region's waterways remains. *See id.* at 738 n.18 ("[B]ecause NEPA can do no more than require the agency to produce and consider a proper EIS, the harm that NEPA intends to prevent is imposed when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires.") (citing *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989)).

[15] MAA argues that these violations are insignificant and are outweighed by the risk of financial harm should the project be enjoined further. We disagree and find that in this case, the risk of permanent ecological harm outweighs the temporary economic harm that MAA may suffer pending further

---

[3]At oral argument, counsel for ONRC suggested that one year of additional study would likely be sufficient.

study. We note in particular that this is not a case where an injunction would halt ongoing economic activity but would simply delay the expansion of an existing facility. *See Lands Council*, 494 F.3d at 780 (noting that this court has "held time and again that the public interest in preserving nature and avoiding irreparable injury outweighs economic concerns") (citations omitted). We also conclude that in this case, the public's interest in preserving the environment favors injunctive relief. *See Earth Island II*, 442 F.3d at 1177.

## CONCLUSION

We reverse the order of the district court granting summary judgment in favor of the Forest Service. We remand the case to the district court and instruct it to promptly enjoin the MASA expansion project contemplated in the 2004 FEIS until the Forest Service has corrected the NFMA and NEPA violations we find in this opinion.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**