**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NORTH CASCADES
CONSERVATION COUNCIL, A
nonprofit Washington corporation,

      *Plaintiff - Appellant*,

  v.

UNITED STATES FOREST
SERVICE, A federal agency of the
United States Department of
Agriculture; KRISTIN BAIL, In her
official capacity as Forest Supervisor,
Okanogan-Wenatchee National
Forest, United States Forest Service,

      *Defendants - Appellees*.

No. 24-1422

D.C. No.
2:22-cv-00293-
SAB

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Stanley Allen Bastian, District Judge, Presiding

Argued and Submitted February 14, 2025
Seattle, Washington

May 2, 2025

Before: William A. Fletcher, Ronald M. Gould, and
        Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Gould

## SUMMARY[*]

### Environmental Law

The panel affirmed in part and reversed in part the district court's summary judgment in favor of the United States Forest Service in an action brought by North Cascades Conservation Council challenging the Forest Service's approval of the Twisp Restoration Project, a forest thinning project in the Okanogan-Wenatchee National Forest in Washington.

Affirming in part, the panel held that the Forest Service was not required under the National Environmental Policy Act (NEPA) to repeat the public comment process between the draft Environmental Assessment (EA) and the final EA because there was an absence of evidence that the intervening Cedar Creek Fire posed new environmental questions or rendered the public's comments on the Draft EA irrelevant. The panel also held that the Forest Service considered a reasonable range of alternatives under NEPA, that the Forest Service's use of the condition-based

_____

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

management process did not inherently violate NEPA, and that such process was permissibly applied here.

Reversing in part, the panel held that the EA's discussion of the Twisp Restoration Project's cumulative effects was insufficient under NEPA because it did not discuss the cumulative effects of the Twisp Restoration Project in combination with the Midnight Restoration Project, which was originally part of the Twisp Restoration Project as envisioned in the Draft EA. The panel remanded for the district court to enter an appropriate order requiring the Forest Service to remedy the deficiencies in the EA in a timely manner, and to determine whether, in light of its revised cumulative effects analysis, an environmental impact statement (EIS) is necessary.

**COUNSEL**

William H. Sherlock (argued), Hutchinson Cox, Eugene, Oregon, for Plaintiff-Appellant.

Shaun M. Pettigrew (argued), Andrew M. Bernie, and Rachel Heron, Attorneys; Todd Kimm, Assistant Attorney General; National Oceanic and Atmospheric Administration, Damage Assessment; Environment and Natural Resources Division, United States Department of Justice; Seattle, Washington, for Defendants-Appellees.

Sarah E. Melton and Sara Ghafouri, American Forest Resource Council, Portland, Oregon, for Amicus Curiae American Forest Resource Council.

Jonathan Wood and Dylan Soares, Property and Environment Research Center, Bozeman, Montana, for Amicus Curiae Property and Environment Research Center.

**OPINION**

GOULD, Circuit Judge:

All judges supporting the continuation of life on our planet need to be sensitive to environmental considerations. Since the 1970s, the United States Congress has passed a succession of environmental laws (for well-known examples, the National Environmental Policy Act, the Clean Air Act, the Resource Conservation and Recovery Act, and the Endangered Species Act). Interest groups favoring deregulation and a hands-off approach to business have also placed their oars in disputed waters of public opinion and advocacy. The judiciary has an important role to play in interpreting and applying our environmental laws fairly to resolve disputes between parties, when competing interests are at stake. The case before us involves competing interests of logging and environmental interest groups. We point out that there is a practical distinction between, on the one hand, logging for the sake only of harvesting timber, and, on the other hand, thinning trees in a forest for the purpose of promoting a healthier and more resilient forest, better able to suppress or to weather the tidal wave of wildfires afflicting the country. However, almost all judges would agree that the law must be applied impartially, whether invoked by business groups, environmental groups, or some other interest.

North Cascades Conservation Council ("NCCC") appeals the district court's grant of summary judgment in favor of the United States Forest Service ("Forest Service") on NCCC's claims in connection with the Forest Service's approval of the Twisp Restoration Project.  The Twisp Restoration Project covers 24,140 acres of forest land within the Okanogan-Wenatchee National Forest ("Forest").  Its stated purpose is to make the Forest less vulnerable to high intensity wildfires, insect infestations, and disease outbreaks by authorizing, among other treatments, tree-thinning and prescribed burnings.

The National Environmental Policy Act of 1969 ("NEPA") is a procedural statute that "requires federal agencies to take a 'hard look' at the environmental consequences of their actions." *Env't. Def. Ctr. v. Bureau of Ocean & Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022). NEPA requires agencies to prepare an Environmental Impact Statement ("EIS") for "major Federal actions."  42 U.S.C. § 4332(C).  If an agency is unsure whether its action will have significant environmental impacts, it may prepare an Environmental Assessment ("EA") first.  40 C.F.R. § 1508.1(j) (2024).

NCCC contends that the Forest Service was required under NEPA to repeat the public comment process after circulating its final EA.  NCCC also contends that the EA that the Forest Service prepared in order to determine whether an EIS was necessary is insufficient under NEPA. Finally, NCCC contends that NEPA requires an EIS in connection with the Twisp Restoration Project.

We have jurisdiction to review this appeal under 28 U.S.C. § 1291.  We affirm in part and reverse in part. Affirming in part, we conclude that the Forest Service was

not required to repeat the public comment process between the draft EA and the final EA; and that the EA considers a reasonable range of alternatives.  Reversing in part, we conclude that the EA's discussion of the Twisp Restoration Project's cumulative effects is insufficient under NEPA.  We reverse and remand for the district court to enter an appropriate order requiring the Forest Service to remedy the deficiencies in the EA in a timely manner.[1]

## I.   FACTS AND PROCEDURAL HISTORY

### A

The Twisp Restoration Project area at issue lies in a portion of the Forest managed by the Forest Service under a 1989 land and resources management plan (the "Forest Plan").  In November 2012, the Forest Service finalized a document entitled "The Okanogan-Wenatchee National Forest Restoration Strategy: adaptive ecosystem management to restore landscape resiliency" (the "Restoration Strategy").  The Restoration Strategy identified the need "to restore the sustainability and resiliency of forested ecosystems" in the Forest, because of increased susceptibility to wildfire, insect outbreaks, and habitat decline.  With this goal in mind, the Forest Service identified Potential Landscape Treatment Areas ("PLTAs").  Projects, such as the one at issue in this case, were then developed within the PLTAs.

In April 2019, the Forest Service completed the Twisp Landscape Evaluation.  This Evaluation determined that

---

[1] Because we reverse in part and remand for a reassessment of the EA, we need not decide at this time whether an EIS had to be prepared.  The panel, however, retains jurisdiction to consider any future appeal in this case.

previous management in the Twisp Restoration Project area "has caused widespread degradation of forest, rangeland, watershed condition and stream habitat, and has increased the risks of uncharacteristically severe wildfire," resulting in a need for ecological restoration projects. The Evaluation reached this conclusion by comparing current conditions with "reference conditions," defined as the historic and projected future range of ecosystem composition in the Twisp Restoration Project area, to "identify significant areas of departure." The Evaluation determined that prescribed burning could be used to thin out vegetative fuel to reduce the risk of severe wildfire while tree-thinning could create space for larger and more resilient trees, and road-related impacts on the aquatic environment could be mitigated via closing, relocating, and upgrading roads.

Development of the Twisp Restoration Project began in June 2019, in a 79,682-acre area of the Methow Valley Ranger District covered by the Twisp Evaluation. In November 2019, a scoping letter was sent to 362 individuals, groups, and agencies describing the proposed project, scheduling a public open house, and inviting comments on the proposal. The scoping letter described five needs for a 77,038-acre area within the Methow Valley Ranger District, which were incorporated in the Draft EA: (1) protecting riparian habitat for ESA-listed species and increasing watershed resiliency; (2) increasing vegetation resiliency; (3) creating and maintaining wildlife habitat, including late-successional and old-growth forest; (4) modifying the areas of the Forest in and around the Wildlife-Urban Interface to reduce fire intensity and allow better access for firefighting crews; and (5) improving the transportation system in the Forest.

B

The Forest Service provided thirty days for public comment on the initially disclosed details of the Twisp Restoration Project. After receiving responses, including a response from NCCC, the Forest Service issued a Draft EA in October 2020. The Draft EA considered a no-action alternative and a proposed action alternative. The Draft EA also considered several other alternatives but eliminated them from detailed study because the Forest Service concluded that these other alternatives would not meet the needs of the Twisp Restoration Project. The Draft EA's proposed action, which involved understory thinning, overstory thinning, prescribed burning, and other activities, would take place over 77,037 acres during a thirty-year timeframe.[2]

The Forest Service initially provided only thirty days for comment on the Draft EA. But the comment period was extended an additional month because of the intervening COVID-19 pandemic. During that time, the Forest Service also hosted a virtual open house and facilitated a self-guided tour of the Twisp Restoration Project area. The Forest Service received 1,029 comments on the Draft EA. These included comments from NCCC and its members.

C

In August 2021, between the close of the Draft EA comment period and the release of the Final EA, the Cedar

---

[2] Overstory thinning refers to the removal of large trees that make up the forest canopy, while understory thinning refers to the removal of smaller trees and shrubs between the forest canopy and the ground. *See* Overstory, Merriam-Webster, https://www.merriam-webster.com/dictionary/overstory; Understory, Merriam-Webster, https://www.merriam-webster.com/dictionary/understory.

Creek Fire burned through areas of the Forest originally included in the Twisp Restoration Project area. In response, the Forest Service revised the proposed project to omit areas potentially affected by the fire, explaining those revisions in a virtual public meeting in January 2022. Without reopening the public comment period, the Forest Service released the Final EA in April 2022. The Final EA, like the Draft EA, analyzed in the detailed study only the proposed action alternative and the no-action alternative, and the five stated Project needs remained largely the same.

Because of the Cedar Creek Fire, the Forest Service reduced the size of the Twisp Restoration Project by 69%, excluding most of the area burned by the fire, along with a significant area that was not burned by the fire. The roughly 50,000-acre area excluded from the Twisp Restoration Project became a separate proposed project, the Midnight Restoration Project. As a result of the overall reduction in acreage, the Forest Service's proposed actions were also reduced: proposed understory thinning decreased by 55%, proposed overstory thinning decreased by 63%, and prescribed fire treatments decreased by 55%. Proposed actions in certain areas were dropped, and temporary haul roads and haul routes were reduced or modified.

In response to comments, the expected duration of the Twisp Restoration Project decreased from thirty years to twenty. The Final EA provided for, among other actions, non-commercial understory vegetation thinning on up to 13,812 acres; commercial overstory vegetation treatments on up to 8,151 acres targeting trees of a certain diameter; fuel reduction via prescribed burning; the removal of hazardous trees; the replacement of culverts; and the construction, maintenance, and closure of roads.

The Forest Service released a draft Decision Notice ("DN") and Finding of No Significant Impact ("FONSI") concurrently with the Final EA.  Under Forest Service regulations, this triggered a 45-day period during which individuals and organizations who previously commented on the scoping letter of the Draft EA could object to the Final EA or draft DN/FONSI.  36 C.F.R. §§ 218.2, 218.5.  The scope of those objections could include "new information that arose after the opportunities for comment."  36 C.F.R. § 218.8(c).  The Forest Service received several objections, including extensive objections from NCCC.  The Acting Deputy Regional Forester discussed those objections in a meeting with objectors on July 12, 2022, and provided written responses to the objectors two weeks later.  The Forest Supervisor adopted the proposed action concerning the Twisp Restoration Project in a final DN/FONSI dated July 20, 2022.  The FONSI concluded that an EIS was not required because the Twisp Restoration Project would not "have a significant effect on the quality of the human environment."

## D

NCCC filed its complaint on November 22, 2022, alleging three claims of NEPA violation, and a claim for relief under the Federal Advisory Committee Act, which NCCC later voluntarily waived in its motion for summary judgment.  The Forest Service filed a cross-motion for summary judgment.  On January 17, 2024, the district court, in a written opinion and order, granted Defendants' cross-motion, denied Plaintiff's motion, and entered judgment for Defendants.  NCCC appeals the district court's final order and judgment.

## II.  STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo*.  *Native Ecosystems Council v. Marten*, 883 F.3d 783, 789 (9th Cir. 2018).  The Administrative Procedure Act ("APA") governs our review of the Forest Service's compliance with NEPA.  *See Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc); *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc).  Under the APA, we may set aside the Forest Service's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This deferential standard requires us to "'ensure that the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made.'"  *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011) (quoting *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)).  But it does not let us "substitute our judgment for that of the agency."  *Id*.

## III.  DISCUSSION

NCCC contends that the Forest Service violated NEPA because its EA is inadequate and does not constitute the requisite "hard look" at potential environmental impacts.  Specifically, NCCC contends that the Forest Service was required under NEPA to reopen the comment period following the changes made to the Twisp Restoration Project in response to the Cedar Creek Fire.  NCCC also contends that in issuing the EA, the Forest Service used an overly narrow statement of need and purpose and did not consider a reasonable range of alternatives.  Finally, NCCC contends that the EA does not contain a reasonably thorough

discussion of the Twisp Restoration Project's direct, indirect, or cumulative effects because the EA relies on maximum effects analysis and does not address the Midnight Restoration Project.  We consider each argument in turn.

## A.  The public comment process

First, we address NCCC's argument that the Forest Service was required under NEPA to repeat the public comment process after the Cedar Creek Fire led to changes between the Draft EA and the Final EA.  We have held that NEPA requires an agency preparing an EA to "provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008).  Here, the Forest Service did so.

"[A]n agency is required to repeat the public comment process when the EA includes substantial changes relevant to environmental concerns."  *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1067 (9th Cir. 2023); *see also California v. Block*, 690 F.2d 753, 771 (9th Cir. 1982) (repeating the public comment process is unnecessary "when only minor modifications are made" to a draft EA).  Where a change to a proposed action only lessens the environmental impact, we are less likely to consider it a substantial change. *See Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1048 (9th Cir. 2011) (considering the Forest Service's obligation to prepare a supplemental draft EA).

NCCC contends that the changes made in response to the Cedar Creek Fire—namely the reduction in size of the Twisp Restoration Project by 69%, and the ensuing changes to

temporary haul roads and haul routes necessitated by the reduced size—are substantial changes triggering a requirement to repeat the public comment process under NEPA. We disagree. First, the factors we identified in *Block* weigh against the conclusion that the modifications here are substantial. Second, like the modification at issue in *Russell Country Sportsmen*, the modification here lessens the environmental impact of the Twisp Restoration Project, and the circumstances in which a modification that lessens impacts may still require supplementation do not apply here. *See Russell Country Sportsmen*, 668 F.3d at 1048–1049.

*Block* encourages us to consider (1) whether a proposed action was within the range of alternatives the public could have reasonably anticipated the Forest Service to consider, and (2) whether the public's comments on the draft EA apply to the chosen alternative or inform the Forest Service of the public's attitudes toward the chosen alternative. *See* 690 F.2d at 772. Here, the public could not have foreseen that the fire would cause the Forest Service to reduce the scope of the Twisp Restoration Project so significantly. But the Draft EA did make the public aware that the Twisp Restoration Project would encompass the current Project area; the Final EA only reduced the overall Project area, as opposed to expanding it into a new area.

The substance of the proposed treatments and the method of determining where and when they will be applied also remain unchanged between the Draft EA and the Final EA. *Cf. id.* (concluding that decisional criteria employed in the Proposed Action differed from the criteria employed in the Draft EA). As a result, most of the public comments (for instance, those relating to commercial timber harvest, the duration of the Twisp Restoration Project, the amount of condition-based management, and alternative fire treatment

options) remain relevant to the Final EA and inform the Forest Service of the public's opinion with respect to the Final EA. *Cf. id.* (concluding that "the relevance of public comment on the draft EIS" was seriously diluted).

Because the proposed modifications reduce the scope of the Forest Service's proposed actions, these modifications also lessen the environmental impact of the Twisp Restoration Project, making it less likely that the modification was substantial. *See Russell Country Sportsmen*, 668 F.3d at 1048–49. *Russell Country Sportsmen* notes that a new alternative that lessens the environmental impacts yet alters the overall cost-benefit analysis, goes "to the heart" of the proposed action, or poses new environmental questions that may require supplementation. *Id.* at 1048–49. None of those circumstances appear here.

First, the Forest Service is not justifying adverse environmental impact by citing some other benefit that has been diminished by the reduced scope, so the cost-benefit rationale does not control here. *See id.* (citing *Massachusetts v. Watt*, 716 F.2d 946, 948–49 (1st Cir. 1983)). Second, because the proposed treatments have not substantively changed in response to the Cedar Creek Fire, the modification does not go "to the heart" of the proposed action. *Id.* at 1049. Finally, because the Twisp Restoration Project has only been reduced in scope and because the reduced area was not substantially affected by the Cedar Creek Fire, "there is very little reason to believe the modified plan will have environmental impacts that the agency has not already considered." *Id.*

Reducing the scope of a proposed project after a wildfire could lead to different environmental impacts that might in

some cases justify repeating the public comment period.  As an example of that possibility, new environmental stressors could result from a wildfire, or fire mitigation efforts might be less effective if not performed over a greater geographic scope.   Here, however, the record does not show any evidence of such concerns.  The only new concern raised by NCCC is lack of analysis in the Final EA specific to project areas omitted from the Final EA.  We have seen no evidence that the public has other new concerns resulting from the reduction in geographic scope.  Because the circumstances raised by *Russell Country Sportsmen* are not present here, we conclude that the original public comment process sufficiently permitted the public "to weigh in with their views and thus inform the agency decision-making process." *See Bering Strait Citizens for Responsible Res. Dev.*, 524 F.3d at 953.[3]

## B.  Range of alternatives

NCCC next contends that the EA violates NEPA because the Forest Service relied upon an overly narrow statement of "purpose and need" in the EA and did not consider a reasonable range of alternatives.  We reject this contention.

NEPA requires agencies to "give full and meaningful consideration to all reasonable alternatives" in an EA. *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008).  Although an agency's

---

[3] To the extent that NCCC argues that the APA, rather than NEPA, required the Forest Service to repeat the public comment process, NCCC waived any claim based on the APA's notice and comment requirement by not asserting that claim before the district court. *See Baccei v. United States*, 632 F.3d 1140, 1149 (9th Cir. 2011) ("Absent exceptional circumstances, we generally will not consider arguments raised for the first time on appeal, although we have discretion to do so.").

discussion of alternatives may be briefer in an EA compared to discussion in an EIS, an agency's failure to explore a viable alternative in an EA is still a violation of NEPA. *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013). "In considering which alternatives to analyze, agencies must provide a 'detailed statement' regarding why they were eliminated or not considered." *Env't. Def. Ctr. v. Bureau of Ocean & Energy Mgmt.*, 36 F.4th 850, 876 (9th Cir. 2022) (citing 40 C.F.R. §§ 1502.14(a); 1508.9(b)).

### 1. Purpose and need statement

Agencies have "'considerable discretion to define the purpose and need of a project.'" *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 866 (9th Cir. 2004) (quoting *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998)). But this discretion is not unlimited and unbounded. "The stated goal of a project necessarily dictates the range of 'reasonable' alternatives, and an agency cannot define its objectives in unreasonably narrow terms." *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). A statement of purpose and need is unreasonably narrow if it preordains the outcome. *Env't Def. Ctr.*, 36 F.4th at 876.

Here, as stated in our review of facts above, the Forest Service identified its purposes of the proposed Project: (1) protect and maintain aquatic, riparian, and hydrologic resources and restore areas impacted by past management; (2) modify vegetation structure, composition, and patterns to develop, maintain, or restore healthy forest stand structures that can respond to wildfire and climate change in a resilient manner and that are consistent with historic and future ranges of variability; (3) protect, develop, and/or enhance late and old forest stands for wildlife species dependent on

them and reduce the risk of large-scale habitat loss to fires by increasing resilience of habitats to wildfire; (4) modify the structure, composition, and pattern of forest stands in and around the Wildlife-Urban Interface to reduce fire intensity and enable the use of direct firefighting strategies; and (5) provide a transportation system that is affordable, safe, and efficient for administration, public use, and protection of Forest Service lands.

These purposes are stated broadly and are not overly narrow. NCCC contends that stated needs one through four rely on circular logic by arguing that additional fire suppression and timber harvest will not solve problems created by past fire suppression and timber harvest. This argument challenges the logic of the Twisp Restoration Project's proposed actions, rather than the statement of purpose and needs, which does not necessarily require fire suppression or timber harvesting. Indeed, NCCC acknowledges that some of the Twisp Restoration Project's stated needs are "admirable in the abstract" and that it takes issue only with the Twisp Restoration Project's method of addressing those needs. NCCC does not explain how the needs identified are unreasonably defined and would "foreclose consideration" of alternative restoration measures. *Westlands Water Dist.*, 376 F.3d at 867.

NCCC also contends that the premise underlying the statement of needs is flawed because the Final EA does not explain how aligning the Twisp Restoration Project area with the "desirable 'historic' conditions" the Forest Service identified would make the Forest more resilient or how the proposed treatments will result in the Forest's return to those conditions. NCCC did not raise this challenge before the district court, and we decline to address it here. *Baccei*, 632 F.3d at 1149.

### 2.  "Phased approach" and "natural succession approach"

"That the statement of 'purpose and need' did not violate NEPA's procedural commands does not necessarily mean that the agencies considered a reasonable range of alternatives . . . ." *Env't Def. Ctr.*, 36 F.4th at 876–77. "The existence of a 'viable but unexamined alternative' renders the environmental review conducted under NEPA inadequate." *Id.* (quoting *Westlands Water Dist.*, 376 F.3d at 868). But agencies do not need to consider alternatives that are not feasible, ineffective, or inconsistent with an area's management objectives, *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006), or alternatives that do not advance the project's purpose, *Native Ecosystem Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1247 (9th Cir. 2005). An EA must consider a "no action" alternative and a "preferred alternative." *See id.* at 1245–46. Beyond that, there is no "numerical floor on alternatives to be considered." *Id.* at 1246.

We conclude that here the Forest Service sufficiently analyzed viable alternatives under NEPA. The Forest Service analyzed in depth both a no-action alternative and a proposed action alternative. The Forest Service also included a discussion of eleven other alternatives rejected from detailed study. *See Env't. Def. Ctr.*, 36 F.4th at 876. Nonetheless, NCCC contends that the Forest Service did not examine two viable alternatives: the "phrased approach" and the "natural succession approach."

The "phrased approach" would split the Twisp Restoration Project into four or five project "phases" executed one after the other. An initial project would be analyzed, approved, and implemented in a three-to-five-year

time span. This initial project would be followed by monitoring, reconsideration, and, if necessary, three or four more successive planning processes to approve each subsequent project phase. The EA addresses and rejects this alternative. Although the Forest Service acknowledged that it could create additional opportunities to receive public input and to gather monitoring data, this alternative "was not developed further" because it would break up each treatment into three phases (analysis, approval, and implementation), "roughly tripling the time spent on analysis and implementation, deferring implementation of treatments . . . and delaying planning efforts for other restoration projects." The Forest Service correctly determined that such a significant delay in implementing proposed treatments would render the phased approach ineffective, because it would require the Forest Service to analyze and implement each proposed treatment in successive phases, rather than analyzing and implementing multiple treatments concurrently. *See N. Alaska Env't Ctr.*, 457 F.3d at 978.

The EA similarly discusses and rejects the "natural succession" alternative, concluding that it is encompassed by the no-action alternative. *See id.* (alternatives similar to those discussed need not be addressed). NCCC contends that a natural succession alternative differs from the no-action alternative, because it would eliminate human intervention, whereas the no-action alternative provides for standard resource protection and maintenance activities. In reply to the Forest Service's argument that such an alternative would prevent the Forest Service from carrying out its legally required management responsibilities, NCCC claims that the natural succession alternative "would still allow the Forest Service to fulfill its obligation to utilize the forest for multiple uses" and "would necessarily require

some amount of modification to the vegetation and wildlife habitat."

We conclude that NCCC has not met its burden to show that the natural succession alternative is a feasible alternative. *See Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 576–77 (9th Cir. 1998). It is not clear how a natural succession alternative could simultaneously eliminate human intervention, let the Forest Service fulfill its legal obligations, and require modification to the Forest. Because NCCC has not provided sufficient detail to determine what a natural succession alternative would involve, we conclude that the Forest Service was not obligated under NEPA to consider it.

## C. Direct, indirect, and cumulative effects

NCCC contends that the EA does not adequately consider the direct, indirect, and cumulative effects of the Twisp Restoration Project. An EA must contain a "'reasonably thorough discussion of the significant aspects of probable environmental consequences,'" so that we can ensure the agency took a "hard look." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998) (quoting *Or. Nat. Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997)). "To 'consider' cumulative effects, some quantified or detailed information is required." *Id.* at 1379. "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Id.* at 1380. "Nor is it appropriate to defer consideration of cumulative impacts to a future date." *Id.*

## 1. Condition-based management

NCCC contends that reliance on condition-based management and maximum effects analysis violates NEPA's requirement that the agency take a "hard look" at the proposed action's impacts. Condition-based management involves developing proposed treatments based on pre-identified management requirements but deferring specific decisions about which treatments will be applied in particular locations until the Forest Service conducts pre-implementation field reviews. The Forest Service asserts that this method lets the Forest Service be more flexible and responsive to conditions on the ground at the time that the treatments are applied. However, it prevents the Forest Service from giving the public important detail about a project's effects. In an attempt to mitigate this downside of condition-based management, the Forest Service used "maximum effects" analysis, which considers the maximum potential effects of a project assuming all possible treatments are implemented. NCCC nevertheless contends that "[c]ondition-based management is inherently violative of NEPA because it fails to inform the Public what will in fact occur as the project is implemented over its twenty-year lifespan."

We conclude that the Forest Service's site-specific maximum effects analysis was sufficient here. NCCC relies on a district court decision in *Southeast Alaska Conservation Council v. United States Forest Service*, 443 F. Supp. 3d 995 (D. Alaska 2020). *Southeast Alaska Conservation Council* is not persuasive here. First, an EIS was at issue there, which "must compare the environmental impacts of different alternatives, not just determine whether environmental impacts will occur," and so requires more detailed information than an EA. *Id.* at 1013. Second, that case

involved the application of condition-based management to 1.8 million acres, and the project's EIS omitted the location of proposed timber harvest and road construction. *Id.* at 1009. The project EIS there did not "include a determination—or even an estimate—of when and where the harvest activities or road construction authorized by each alternative will actually occur." *Id.* at 1009.

Here, by contrast, the total area subject to condition-based management is at most 21,149 acres. Within that fairly small area, the Forest Service has identified specific methods of understory thinning, overstory treatments, and fuels reduction and provided unit-by-unit maps of the maximum effects of each treatment. The Forest Service's maximum effects analysis here would give the public significantly more information than did the maximum effects analysis in *Southeast Alaska Conservation Council* about where proposed activities may occur and which specific methods will be used. *See id.* at 1010 (stating that the EIS there "does not delineate harvest units, let alone identify planned activities within them.").

This is a close case, and we share the *Southeast Alaska Conservation Council* district court's concern that excessive reliance on condition-based management detracts from a decisionmaker's or public participant's ability to assess a proposed action's environmental consequences. *See id.* at 1014. But because of the small size of this project and the extensive mapping provided, we conclude that the Forest Service's information about where treatments will occur and the maximum effects of those treatments is sufficiently

quantified and detailed to satisfy NEPA's requirements for EAs.[4]

## 2. Midnight Restoration Project

NCCC further contends that the EA is insufficient under NEPA because it does not discuss the cumulative effects of the Twisp Restoration Project in combination with the Midnight Restoration Project, which was originally part of the Twisp Restoration Project as envisioned in the Draft EA. On this issue, we agree with NCCC that the EA is insufficient under NEPA. We have held that when considering a project's cumulative effects, an agency must consider other "reasonably foreseeable" projects. *Env't Prot. Info. Ctr. v. U.S. Forest Serv.* (*EPIC*), 451 F.3d 1005, 1014 (9th Cir. 2006).

The Forest Service contends that *EPIC* controls the outcome of this case. That case involved a proposed timber sale ("Knob") that was originally part of a larger, abandoned project ("Comet"). *Id.* In its cumulative effects analysis for the Knob project, the Forest Service did not consider a second timber sale ("Meteor") that was also originally a part of Comet. *Id.* Despite the projects' common origin, we held that it was not arbitrary or capricious for the Forest Service to omit Meteor, because Meteor was "in the initial planning stage" and its parameters were unknown. *Id.* at 1014–15.

---

[4] NCCC also contends that the EA does not correctly determine the Twisp Restoration Project's maximum effects, because it does not consider additional trees that might be removed pursuant to the Twisp Restoration Project's exceptions to cutting restrictions. Because NCCC did not raise this argument either before the Forest Service or before the district court, we conclude that NCCC's argument is waived. *See All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 487–88 (9th Cir. 2023).

Like the projects in *EPIC*, the Twisp Restoration Project and Midnight Restoration Project share a common origin. After the Cedar Creek Fire burned part of the original Twisp Restoration Project area as conceived in the Draft EA, the Forest Service removed most areas affected by the fire from the proposed action. While the Twisp Restoration Project as proposed by the Final EA primarily covers area unaffected by the fire, the Midnight Restoration Project covers the remainder of the proposed project area as envisioned by the Draft EA.

But we agree with NCCC that *EPIC* is distinguishable from this case. Although the Forest Service had not decided if it would develop the Midnight Restoration Project as of a month before the Final EA's release, a Forest Service official wrote via email that he "anticipate[d] that the decision whether to take Midnight forward as a project or not will happen in the next month," and that he thought it was "likely that Midnight will be developed as a project." In *EPIC*, the specifics of the treatment prescriptions and the size of the Meteor project were unknown, and there is no indication that the Forest Service had done any work to estimate the environmental impacts of the second timber sale. *Id.* at 1014. Here, by contrast, the Forest Service's original Draft EA analyzed proposed treatments and their impacts throughout the entire Midnight Project area.

Although the Cedar Creek Fire introduced uncertainty as to which treatments were needed and the extent of the treatments needed, there is little indication in the record that the fire would have significantly changed the Forest Service's approach in the Midnight Restoration Project area, particularly because the majority of the Midnight Restoration Project area was not directly impacted by the fire. To the contrary, a Forest Service official acknowledged

that, "The early indications are that there is still a need for treatments post-fire," and "[d]ata from the original Twisp Restoration analysis would help inform the proposed action with some updates to reflect the changes from the fire."  The Forest Service here, then, had significantly more information about the potential effects of Midnight than the Forest Service had about Meteor in *EPIC*.

Finally, unlike in *EPIC*, the Forest Service made no effort to analyze the effect of the Midnight Restoration Project in its response to comments or objections. *Cf. id.* at 1014–15 ("[L]ater, in response to comments to the EA, [the Forest Service] *did* analyze the effect of the Meteor project based on the information known about the proposed project at that time." (emphasis in original)).  Rather, the Forest Service only said that the areas removed from the Twisp Restoration Project were "under assessment to determine the degree to which" the areas were affected by the fire.  This absence of quantified or detailed information is not sufficient to rectify the Forest Service's NEPA violation.  Given the extent of the information the Forest Service had, the Midnight Restoration Project and its effects were reasonably foreseeable, and the Forest Service had a duty to analyze the Midnight Restoration Project in the Final EA.  We hold that the Forest Service did not take the "hard look" required by NEPA, and we reverse the district court's grant of summary judgment in favor of the Forest Service on this issue.

Because we reverse on this issue, we do not reach NCCC's contentions that the Forest Service should have prepared an EIS for the Twisp Restoration Project.  While a full EIS may be necessary in light of the Twisp Restoration Project's cumulative effects, we leave that decision for the Forest Service to consider in the first instance on remand. *See W. Watersheds Project*, 719 F.3d at 1053–54 (declining

to reach the question of whether the agency should have prepared an EIS where the EA process was deficient); *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1124 (9th Cir. 2010) ("NEPA is not a paper exercise, and new analyses may point in new directions.").

## IV.  CONCLUSION

We hold that the Forest Service was not required to repeat the public comment process because there is an absence of evidence that the Cedar Creek Fire poses new environmental questions or renders the public's comments on the Draft EA irrelevant.  We also hold that the Forest Service considered a reasonable range of alternatives under NEPA, that the Forest Service's use of the "condition-based management" process does not inherently violate NEPA, and that such process was permissibly applied here.  By contrast, we hold that the EA did violate NEPA by omitting consideration of the Midnight Restoration Project in its cumulative effects analysis.  We reverse and remand for the district court to enter an appropriate order requiring the Forest Service to remedy the deficiency in the EA for the Twisp Restoration Project and to determine whether, in light of its revised cumulative effects analysis, an EIS is necessary.

Because this is a mixed judgment, each party shall bear its own costs.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**